# RESIDENTIAL LEASE AGREEMENT

2025 1

EQUAL HOUSING OPPORTUNITY

OPTIONS REALTY

Agreement Date: **02/27/2026**

Per this Residential Lease Agreement (hereinafter referred to as the Agreement) between **Tia Frasier** Tenant(s) (hereinafter referred to as Resident), and 3 Options Realty, LLC. (Hereinafter referred to as Management), Management leases to Resident and Resident leases from Management the property known as: **5500 Sierra Trl Atlanta, GA 30349** (hereinafter referred to as Premises) under the following conditions:

**1. Occupants:** All Residents intending to occupy Premises are listed above and agree to sign this Agreement. Dependents (children under the age of 18 years) intending to occupy must be listed on this Agreement and are: **Allyn.** Resident warrants the above-mentioned persons shall be the only occupants of the Premises except for short-term visitors (7 consecutive days or less). The total number of Residents and Dependents occupying Premises shall not exceed **2**, without written permission of Management. All Residents listed as parties to this lease agreement shall be jointly and severally liable for rent, and other monies owed Management, and all damage incurred on the Premises.

**2. Lease Term and Delivery of Premises:** This Agreement shall be for an Original Term of 1 year beginning 12:00 noon **February 28, 2026** and end 12:00 noon the last day of **March 2027** (hereinafter referred to as the "Anniversary Date"). If there is a delay in delivery of occupancy by Management, rent shall be abated on a daily basis until possession is granted. If occupancy is not granted within seven (7) days after the beginning of Original Term, then Resident may void this Agreement and have full refund of any deposit. Management shall not be liable for damages caused by a delay except as noted in this paragraph. If there is a delay in taking occupancy by Resident, and Resident does not take occupancy within seven (7) days after the beginning of the Original Term, then Management may void this Agreement and any funds paid by Resident shall be non-refundable.

**3. Agreement renewal:**

**A.** Upon the Anniversary Date, this Agreement shall automatically renew for a twelve-month period unless either party provides the other written notice, to the address of Broker on signature page of this Agreement or to the Resident at the Premises address, at least sixty days prior to an Anniversary Date, of their desire not to renew for another twelve months.

**B.** Upon renewal of this Agreement, at the sole option of Management, rent may increase up to 5% of current rent rate.

**4. Lease termination:**

**A. Termination upon renewal:** Either party may terminate this Agreement without penalty, on an Anniversary Date, with written notice given at least 60 days prior to the Anniversary Date. Notice: Oral notice is insufficient under any circumstances. Written notice must be made by certified mail or registered mail, fax to the official office fax of Management (shown below), email to the official Management email (shown below), or by personal delivery to Management, and at least sixty days prior to the Anniversary Date.

**B. Termination by Dispossessory.** In the event you are evicted by writ of possession resulting in a set out, you agree to remain liable for all damages and unpaid rent through the re-rental date or the end of the term of the Agreement.

**5. Rent:**

**A. Amount:** Rent of **$18,600** per year is payable in installments of **$1,550**, monthly in advance (Current Rent), and is due the first of each succeeding month prior to close of business or it is considered late.

**B. Resident Benefit Package:** Resident agrees to participate in Manager's Resident Benefits Package (RBP) as presented before executing this Agreement. Resident agrees to pay $**35** per month as Resident's share of the cost and holds Manager harmless if any third-party provider in the package fails to perform. RBP cost is payable on the same schedule as the Current Rent.

**C. Rent Adjustments:** Resident understands and agrees that this home is ☐ or is not ☒ designated as a HUD (Housing and Urban Development) HOME affordable property, and that if it is that the rental limit has been established by a HUD schedule, and that it is subject to change on the anniversary of this Agreement. Management shall provide Resident with written notice of this change when the annual limit schedule is published by HUD. Such changes are nonnegotiable as they are outside of the control of either Management or Resident.

**D. Late charge:** If rent is not received as prescribed above, Resident agrees to pay a late fee of 10% of the Current Rent amount. Checks sent via the mail are done at the sender's own risk. Rents will be considered unpaid until actually received by Management.

**E. Methods of Payment:** Rental payments may be tendered by personal check, money order, debit card, or through the tenant portal on the company website. Instructions will be provided on how to use the portal payment method upon move-in. Portal payments are the best and safest way to tender payments. **Payment by credit card is prohibited. Although this method of payment may be available on the tenant portal, use of this feature will be deemed a default of the lease subjecting the Tenant to immediate dispossessory.**

**(1) Checks:** If rent is late, or the bank, for any reason, refuses any check, all payments at that time must be made in certified funds. If a check is returned, and in accordance with Georgia Law, Resident agrees to pay a minimum of $30.00

or 5% of the check amount, whichever is greater, but not to exceed a total charge of $500, any fees charged to Management by Management's bank, plus a late charge as defined above. Management may require any future payments to be made by certified check or money order. Management may, upon 15 days written notice, require certified funds for any reason.

**(2) Payment by Money Order:** If Resident pays rent by money order, Resident assumes responsibility for obtaining a cash-receipt from Management. If Resident fails to obtain a receipt and Management later claims the full rent amount was not paid, Resident agrees to pay the shortage amount, as rent due and payable. Delivery certified by courier does not accomplish the requirement for a cash-receipt. This only certifies receipt of the envelope, but not the amount or the contents.

**F. Additional Fees:** Resident acknowledges certain action or inaction of resident can lead to additional fees. A list of additional fees is located in the Resident Handbook.

**G. Allocation:** All funds received from Resident shall first be applied to outstanding late fees, NSF fees, administration fees, warrant fees, maintenance charge backs, and any other fees due Management under this Agreement, and the remainder to rent.

**H. Prohibition against withholding rent for repairs:** The Resident is prohibited from making any repairs or renovations to the home without the express written consent of Management. In the event the Resident does so without the consent of Management, the Resident shall not, under any circumstances, deduct the sums of those repairs from any rents due and payable.

**6. Security deposit:**

**A. Tender and Return:** At the date and time of move-in inventory, Resident agrees to tender a refundable Security Deposit of **$2,325** for fulfillment of Resident's obligations under the terms of this Agreement, which sum includes deposits for pets as otherwise prescribed herein. The Security Deposit will be returned in part or in full, without interest, within one month after the termination of this Agreement, or the surrender and acceptance of the Premises, unless retained by Management for such causes as provided for in this Agreement. In the event the Premises Owner suffers a foreclosure, all deposits and non-disbursed rents, less any fees due Management, will be disbursed as determined by state statute or regulation, or as specified by federal law.

**(1.) Security Deposit Alternative:** The following security deposit alternatives, if checked, are agreed upon by Resident and Management. Any security deposit alternative not checked is not a part of this agreement. No Security Deposit Alternative shall negate Residents responsibility for damages.

☒ **Deferred Deposit:** Resident agrees to pay a non-refundable Security Deposit Alternative fee of $75 in certified funds at the time of move in. Management agrees to accept the Security Deposit amount noted above in 3 equal installments due as follows; Installment one shall be due on the first day of the second month of this agreement. Installment two shall be due on the first day of the fourth month of this agreement. Installment three shall be due on the first day of the sixth month of this agreement.

☐ **No Deposit:** In lieu of a Security Deposit in the amount of $_____, Resident shall pay a non-refundable Security Deposit Alternative fee of $_____ in certified funds at the time of move in. Resident shall be liable for all damages beyond normal wear and tear as determined by the move-out inventory. Resident expressly acknowledges that the Security Deposit Alternative fee does not constitute a "security deposit" as defined in OCGA 44-7-30 et seq. Resident further expressly acknowledges that the Security Deposit Alternative fee is a non-refundable sum paid in lieu of Resident having to pay a higher sum as a security deposit pursuant to OCGA 44-7-30 et seq.

**B. Termination of Management Agreement:** In the event that the Premises Owner should early terminate the agreement between Management and Premises Owner, all parties understand and agree that Management shall transfer the Security Deposit to either the Premises Owner or a new management company designated by the Premises Owner. Management shall notify Resident of any such occurrences.

**C. Trust account:** Resident acknowledges and agrees that the Security Deposit may be placed in an interest bearing account and that Management (Holder) will retain interest earned, if any. The security deposit shall be deposited and held in a registered trust account within five banking days of receipt by Management.

**D. Disputed Disbursement:** Resident has the right to dispute Management's damage assessment only if the disputed damages are stated in writing within five business days of the move-out date. Resident will be given notice of the date and time that Management will conduct the final move-out inventory and shall accompany Management to inspect the Premises. Resident waives any right to dispute damages if Resident fails to attend the scheduled move-out inventory. If the Resident fails to attend the move-out inventory, Management shall deliver a copy of assessed damages to the address provided by Resident, if any. If no address has been provided, Management shall mail the list of damages via 1st Class US Postage to the Resident's last known mailing address.

**E.** All parties hereby agree to indemnify and hold Holder harmless from and against all claims, causes of action, suits and damages arising out of or related to the performance by Holder of its duties as related to or as regards the Security Deposit hereunder.

**7. Property Condition/Inventory:** Resident acknowledges receipt of a comprehensive listing of any existing conditions to the Premises, which receipt was prior to the tender of the security deposit. Resident must sign said list, or sign a written dissent listing conditions claimed to exist in or on the Premises prior to occupancy. Residents will indicate on the move-in inventory record, everything on or about the Premises needing repair regardless of significance. This will establish the initial

condition according to the Resident. Management will not repair any cosmetic or nonfunctional items such as carpet blemishes, chipped sinks, etc., nor do any painting inside or out, or do any other repairs unless specifically agreed to by Management in writing prior to actual move-in. The purpose of this inventory is to document the condition of the premises before resident takes possession, not to create a punch list of repairs to be later completed. The move-in inventory shall not be viewed by either party as a list of things promised to be repaired or replaced by Management. The Premises is accepted "as is, where is" by Resident at the time of the move-in inventory.

**8. Occupancy Restrictions:**

**A. Pets:** Pets are ☐ or are not ☒ allowed. See Resident Handbook.

**B. Smoking:** Smoking is ☐ or is not ☒ allowed within the interior of the premises including the garage and basement. When smoking is not allowed, each separate incident of smoking within the interior of the premises constitutes a fine of $250.00. Said fine does not waive Management's right to serve Resident with a notice of violation of the lease or otherwise limit Management from terminating the lease as a result of violating the no-smoking policy. The number of instances shall be the sole determination of management. This provision is a material provision of the lease.

**9. Early termination by Resident:** Provided Resident is not in default hereunder at the time of giving notice, has strictly complied with all the provisions of this Lease, and is current with all fees due Management, Resident may terminate this Lease before the expiration date by doing all of the following:

**A.** Giving Management at least sixty days written notice sent by certified or registered mail, return receipt requested.

**B.** Paying all monies due through date of termination.

**C.** Paying an amount equal to two months' rent.

**D.** Returning the Premises in clean and ready to rent condition.

**E.** Agree to remain liable for all damages and unpaid rent through the re-rental date or the end of the term of the Agreement.

**F.** Paying an administration fee equal to one month's rent as liquidated damages, as the parties agree the precise amount of advertising costs, length of vacancy, and other factors are impossible to ascertain at the outset, and that the sum set forth in this paragraph is reasonable compensation for breach by the Resident under this paragraph. The foregoing shall not relieve Resident of his/her responsibilities and obligations regarding any damages to Premises. No pro-ration will be given for percentage of lease term completed by Resident.

**G.** If Resident vacates the Premises before the Anniversary Date, and fails to follow the Early Termination clause precisely as stated above, this shall be called an abandonment, Resident will be in default of the Agreement and damages will include all expenses incurred by the Premises Owner and/or Management, to get the Premises reoccupied, (or to the next Anniversary Date of the lease) including, but not limited to, lost rent to day of reoccupation, utilities and lawn care during vacancy, Procurement Fee and advertising charged to Premises Owner to re-rent the Premises, plus property/physical damages from the move-out inventory. Management will aggressively attempt to re-rent the Premises so as to mitigate damages and Resident will be responsible for the exact costs incurred as a result of Residents abandoning the Premises. Parties specifically agree that this charge is reasonable, was fairly negotiated between the parties and related to the losses the Premises Owner will experience from a refusal to pay-as-agreed by the tenant.

**10. Early Termination by Management.** (These restrictions and provisions pertain only when Residents are not in default of the Agreement.) Residents agree that Management may terminate the Agreement prior to the Agreement expiration date and Residents agree to vacate the Premises if the following conditions are met:

**A.** Management gives Residents sixty days written notice to vacate. (Residents still owe rent through the 60-day period and may not apply the Security Deposit as Rent.)

**B.** Management pays to Resident an amount equal to one month's rent as compensation for disturbing Residents' quiet enjoyment of the Premises, and for the inconvenience of moving early. This credit will be applied to Residents' account at the time of vacating the Premises and will be included with any applicable Security Deposit refund. The foregoing shall not relieve Residents of their responsibilities and obligations regarding any rent due and payable or for damages to the Premises.

**11. Indemnification:** Resident releases Management and Premises Owner from liability for, and agrees to indemnify Management and Premises Owner against, all losses incurred by Resident as a result of:

**A. Failure to comply:** Resident's failure to fulfill any Terms of this Agreement.

**B. Omissions:** Damages or injuries resulting from any omissions of Resident or Resident's family members, invitees, or licensees.

**C. Resident's invitees:** Any damage or injury happening in or about the Premises to Resident, Resident's invitees, or licensees of Resident that are resultant of noncompliance with the Terms, conditions, and warranties of this Agreement or promulgated rules.

**D. Judgments or liens:** Any judgment, lien, or other encumbrance filed against Premises as a result of Resident's action unless it results from the sole, gross negligence or intentional or willful misconduct of Management or Premises Owner.

**12. No waiver:** Any failure of Management to seek redress of a violation of, or to insist upon the strict and prompt performance of, any covenants or conditions of this Agreement, shall not operate as waiver of any such violation, or of Management's right to insist on prompt compliance in the future with such covenant or condition, and shall not prevent a

subsequent action by Management for any such violation. Acceptance by Management of any late payment of rent, or additional rent, shall not constitute a waiver of any rights of Management, including without limitation, the right to terminate this Agreement as herein provided. The receipt of any rent, or additional rent, by Management with the knowledge of such default shall not operate as a waiver of such default or mutual departure from this Agreement. No provision, covenant, or condition of this Agreement may be waived by or mutually departed from by Management unless such waiver is in writing and signed by Management and Resident.

**13. Service of dispossessory:**

**A.** Resident hereby appoints any person, sui juris and of suitable legal age on the premises, as his/her agent to receive the service of any dispossessory or distress proceedings and notices hereunder, and all notices required under this Agreement, and if no freemen is
available at the time of service, such service or notice may be made by attaching the same on the entrance of Premises and mailing the same via first class mail.

**B.** If Resident fails to pay rent within 72 hours of the due date, a $350 dispossessory administrative fee will be due and payable. Management may decline to accept rent payments unless this fee has been included, along with any late fees and other damages due at the time of payment.

**14. Authorized to manage:** For purposes of compliance with the provisions of O.C.G.A. 44-7-3, Management hereby states that 3 Options Realty, LLC. (Shane Cargile, Broker) whose address is 555 Sun Valley Dr, STE B4, Roswell, Georgia 30076, is authorized to manage the Premises, and to act for and on behalf of Premises Owner as an independent contractor and may receive service of process on behalf of the Premises Owner.

**15. Management not Premises Owner:** While management serves many landlord functions in this Agreement, and may receive service on behalf of Premises Owner, Management is an independent contractor for the Premises Owner, hired to execute the instructions of the Premises Owner. Matters of liability should be addressed in the name of the Premises Owner for service of process. Premises Owner name is, **Dwight Towler** and address for service is same as Management.

**16. Failure to pay rent/perform conditions:** If Resident fails to pay rent or any other sum when due, or otherwise fails to abide by and perform any of the obligations, terms, conditions, or provisions of this Agreement, including but not limited to, failure to reimburse Management for any damages, repairs, or costs when due, abandonment of the Premises, or violation of any rules and regulations set forth herein, each and any such act shall constitute a default under this Agreement. In the event Resident continues to occupy the Premises while in default of the terms of this Agreement, the incident shall be considered an act of holding over and rent shall be due and payable at the rate of double the daily prorated current rent, until paid in full.

**17. Right to Terminate:** If any default continues for three calendar days after written notice of default, Management may, at its option, terminate this Agreement by written notice to Resident and seek any and all remedies under this Agreement and Georgia law.

**18. Right to re-lease upon default:** Management may enter upon and take possession of the Premises and re-lease the Premises at the best rental price obtainable by reasonable effort, and for any term, and for any rent, upon such terms as Management deems proper. Resident shall be liable to Management for the deficiency, if any, between Resident's rent hereunder and the new rental price so obtained by Management.

**19. No trespass by management:** Any action hereunder by Management shall not prejudice any rights of action against Resident as provided in this Agreement or by law, and Management shall not be guilty of trespass or forcible entry as a result of such entry and repossession of the Premises by Management.

**20. Agency disclosure:**

**A. Represent Premises Owners, not Residents:** Management's office brokerage relationship policy is to represent Premises Owners as Sellers and/or Landlords (Seller Agency and Owner Agency), Buyers (Buyer Agency), and Sellers and Buyers in the same transaction with Designated Agency, and Transaction Brokerage. Management is a licensed real estate broker, and as such is representing the Premises Owner in this transaction unless otherwise stipulated.

**B. Authority over this Agreement:** This Agreement is between Resident(s) and Management. The Premises Owner has no authority over this Agreement. Resident agrees not to communicate with the Premises Owner while under this Agreement. All parties acknowledge that 3 Options Realty, LLC is authorized by the Premises Owner to manage the subject Premises of this Agreement. In the event that the management relationship is terminated during the term of this Agreement, Resident hereby releases Management of and from any liability under this Agreement, provided Management has notified Resident of such termination effective date and provided a new point of contact for matters relating to this Agreement.

**C. Buying the property:** Resident acknowledges that Management has an exclusive brokerage relationship with the Premises Owner, which includes the payment by Premises Owner to Management of a real estate commission if Resident purchases the Premises. Resident agrees to communicate solely with Management regarding any interest or offers to purchase said Premises. Should the Resident decide to purchase the premises, Resident recognizes Management as the procuring cause of sale. In the event that resident wishes to contract with another real estate broker in the purchase of this Premises, Resident agrees to pay that broker personally, and not look to the Seller, or Management, for that broker's compensation. Should Resident breach this stipulation, and buy the Premises without inclusion of Management, Resident agrees to pay Management for damages, including but not limited to the real estate commissions Seller owes Management,

collection costs, and attorney fees actually incurred, if any.

**21. Agreement renewal fee:** Resident agrees to pay a $50.00 Administration Fee at each Anniversary Date for a twelve month extension or renewal, or, one hundred dollars for a shorter-term renewal, such as anything less than twelve months.

**22. Receipt of important documents:** Resident acknowledges receipt of the following documents prior executing this Agreement: Booklet Protect Your Family from Lead in Your Home, if the Premises was constructed prior to 1978.

**23. Holding over:** If Resident continues to occupy the premises after the agreed termination date, Resident will be classified an unlawful hold over, absent an express agreement otherwise with Management. If Management files a dispossessory warrant, Resident agrees to compensate Management the cost of such filing plus $350.00 as an administrative fee. If a set-out is later effected, Resident agrees to pay for the total cost of labor and any other reasonable fees incidental to this action. Resident further agrees, rent will accrue at double the daily rate until the possession of the Premises is returned to Management.

**24. Default:**

**A. Default generally:** Resident shall be in default of this Agreement upon the occurrence of any of the following:

**(1)** Resident fails to cure any violation of covenants set forth herein or otherwise fails to abide by and perform any of the obligations, terms, conditions or provisions of this Agreement within 3 days after Management delivers notice of the same to Resident.

**(2)** Resident violates the Rules and Regulations set forth herein three times during the term of the Agreement regardless of whether such violations are cured.

**(3)** Resident files a petition in bankruptcy, in which case this Agreement may be declared voidable by Management at its sole discretion, and if the Resident is in arrears at the time of filing bankruptcy, shall automatically terminate and Resident shall immediately vacate the Premises leaving it in the same condition it was in on the date of possession, normal wear and tear excepted.

**(4)** Resident fails to timely pay rent or any other amounts owed to Management.

**(5)** Resident fails to reimburse Management for any damages, repairs and costs to the Premises or Property (other than normal wear and tear) caused by the actions or neglect of Resident or members of Resident's household and their invitees, licensees and guests. All rights and remedies available to Management by Law or in this Agreement shall be cumulative and concurrent.

**(6)** Resident denies access to the Premises to Management or Contractors of Management when reasonable notice of demand for access has been delivered to Resident. Resident agrees to pay Management $100.00 per incident of access denial in addition to any fee charged by Contractors.

**(7)** Resident has any form of direct communication with the Premises Owner. This includes but is not limited to voice, email, text, video, and social media communications.

**B. Effect of default:** If Resident defaults or is declared in default, under any term, condition or provision of this Agreement, Management shall have the right to terminate this Agreement by giving notice to Resident, and to pursue all available legal and equitable remedies to cure the default. Such termination shall not release Resident from any liability for any amount due under this Agreement. All rights and remedies available to Management by law or in this Agreement shall be cumulative and concurrent.

**C. Charges under default:** If Resident is declared in default, Resident is required to pay, in addition to all other charges in this lease, a Default Service Charge equal to two months rent. Such Default Service Charge is not a penalty and is instead a reasonable pre-estimate of the damaged party's actual damages, which damages are difficult to ascertain, as the parties agree that it would be impossible to accurately estimate actual damages resulting from such default, and that the administrative fees are reasonable compensation. Resident shall also pay any and all costs, including mediation and arbitration fees, attorney fees actually incurred, and any fees and costs awarded by a court of law, if such sums are collected through a legal proceeding.

**25. Notices:**

**A. All notices must be in writing.** All notices, including but not limited to offers, counteroffers, acceptances, amendments, demands, notices of termination or vacating and other notices, required or permitted hereunder shall be in writing, signed by the party giving the notice.

**B. Method of delivery of notice.** Subject to the provisions herein, all written notices shall be delivered either: (1) in person; (2) by an over-night delivery service, prepaid; (3) by facsimile transmission (FAX); (4) by registered or certified U. S. mail, pre-paid return receipt requested, (5) email or (6) text.

**C. When notice is deemed received.** Except as may be provided herein, a notice shall not be deemed to be given, delivered or received until it is actually received. Notwithstanding the above, a notice sent by FAX shall be deemed to be received by the party to whom it was sent as of the date and time it is transmitted provided that the sending FAX produces a written confirmation showing the correct date and the time of the transmission and the telephone number referenced herein to which the notice should have been sent. All written notices to Management shall be delivered using the contact information found on the signature page of this Agreement.

**D. Notice to Management by fax or e-mail or text.** Notices by fax or e-mail or text may only be sent to the e-mail address, text phone number, or fax number of Management as set forth in the Information section of the signature page of

this Agreement or as subsequently provided by Management following the notice procedures set forth herein. If no fax number or e-mail address is included in the Management Contact Information section of the signature page of this Agreement, then notice by the means of communication not provided shall not be valid for any purpose herein. Notice to Management or the affiliated licensee of Management that is working with, but not representing a Party as an Agent, shall not be deemed to be notice to that Party.

**E. Notice to Resident(s) by fax or e-mail or text.** Notices by fax or e-mail or text may only be sent to the e-mail address, text phone number, or fax number of Resident as provided in the application or as subsequently provided by Resident following the notice procedures set forth herein. If no fax number, text phone number or e-mail address is included in the Resident Contact Information on the Application, then notice by the means of communication not provided shall not be valid for any purpose herein.

**F. Certain types of signatures are originals.** A facsimile signature shall be deemed to be an original signature for all purposes herein. An e-mail notice shall be deemed to have been signed by the Party giving the same if the e-mail is sent from the e-mail address of that Party and is signed with a "secure electronic signature" as that term is defined under Georgia law.

**26. Hazardous Equipment and Personal Property:**

Resident shall not introduce to the premises any equipment or personal property that might be considered hazardous or dangerous to Resident or guests of Resident, such as trampolines, pools, hot tubs, etc, or such other equipment or personal property that might increase the insurable liability of the Premises Owner, without the express approval of Management.

**27. Other provisions:**

**A. Material relationship disclosure:** Management and affiliated licensees have no agency or material relationship with either client except as follows: **none**. (A material relationship means one actually known of a personal, familial, or business nature between Management and/or affiliated licensees and a client or customer which would impair their ability to exercise fair judgment relative to another client or customer.)

**B. Severability:** If any provision of this Agreement is or becomes illegal, invalid, or unenforceable in any jurisdiction, that shall not affect the validity or enforceability of any other provisions of this Agreement.

**C. Abandonment:**

**(1) Rent due:** In the event the Resident stops paying rent and vacates the Premises without notice to Management, the Resident will remain responsible for all accruing rent due until Management is able to fill the vacancy with a replacement tenant. If the rent for the new resident is less than that of the replaced Resident, the Resident shall be responsible for the rent difference through the termination date here-in agreed.

**(2) Personal property:** If Resident fails to pay rent and fails to respond to inquiries from Management by the 10th day following the rent due date, and if utilities have been disconnected, Management may consider any personal property remaining on the premises to be abandoned and may be disposed of by Management in any manner. Management is not a bailee of such property.

**D. Fair housing:** 3 Options Realty, LLC, its agents, property managers, and staff fully support and endorse federal fair housing laws. As such, our goal is to treat every Resident equally in all ways pertaining to housing and this Agreement. However, because 3 Options Realty, LLC. is an agent for disparate landlord clients, consistency of policy enforcement in some ways may appear different but shall be consistent within the landlords' portfolio and per their preferences. For example, some landlords may require a different tolerance for late rents or assessment of late fees. If you ever believe you are not being fairly treated, please immediately contact our executive managing broker, Shane Cargile, 678-397-1282.

**E. Condemnation:** In the event the Premises is condemned under an act of eminent domain, or for any other act of law, this Agreement shall terminate effective the date of condemnation and the rights and responsibilities agreed to between Management and Resident shall cease without recourse of one party to the other.

**F. Waiver of homestead rights:** Resident and Resident's family waive all exemptions or benefits under the homestead laws of Georgia.

**G. Entire Agreement:** This Agreement, and any attached written exhibits or addenda, shall constitute the sole, entire, and fully integrated agreement between the Parties. No oral statement or modification of the terms of this Agreement, and no inducement, amendment or advertising flyer, nor any promotional materials, shall be binding, create, or form any part of an agreement between the Parties. This Agreement can only be amended in writing and signed by all Parties to the Agreement.

**H. Signatures / Faxes:** These Premises cannot be leased without the signature of each adult party who will be residing in the Premises. Management and Residents agree this Agreement can be signed by duplicate originals. Faxed and electronic signatures are deemed legal signatures of signor.

**I. Remedies cumulative:** All rights and remedies available to Management by law, including but not limited to those described herein, shall be cumulative and concurrent.

**J. Mortgagor's rights:** Resident's rights under this Agreement shall at all times be automatically subordinate and subject to any Deed to Secure Debt, or Trust, which is now, or shall hereafter be placed on Premises. If requested, Resident shall execute promptly any certificate that Management may request to specifically implement the subordination described in this paragraph.

**K. Time is of the essence:** All references to any notice required to be given, or due dates for rental payments, shall be strictly construed, and any binding notice required herein shall be in writing, hand-delivered, or mailed registered or certified mail in accordance with the provisions herein, or in accordance with Georgia law.

**L. Subletting:** No subletting or assignment of this Agreement is permitted. Assignment of any portion of this Agreement or subletting any portion of Premises without obtaining written permission from Management and shall be deemed a default of this Agreement and may result in termination, for which early termination penalties shall apply. Short-term rental arrangements including those facilitated through platforms such as Airbnb, VRBO, or similar services, as well as house hacking are considered subletting under this Agreement.

**M. Governing law and interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of the state of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than the other. All references to time shall mean time in Georgia.

**N. Arbitration:**

**(1)** As the exclusive means of resolving through adversarial dispute resolution any disputes concerning default of terms, conditions, and warranties arising out of this Agreement, either party may demand that any such dispute be resolved by arbitration administered by an arbitrator selected by Management in accordance with the Georgia Arbitration Code, and each party hereby consents to any such disputes being so resolved. Judgment on the award rendered in any such arbitration shall be entered in any court having jurisdiction, and the judgment shall be final and binding. During any continuance of an arbitration proceeding, the Parties shall continue to perform their respective obligations under this Agreement.

TP
Resident's Initials | Resident's Initials | Resident's Initials | Management's Initials

**(2)** The Parties agree to make available to one another all documents and any evidence intended to be presented in the arbitration hearing, at least 30 days prior to the scheduled hearing date and no later than 30 days after receipt of the notice of arbitration is served.

**(3)** This arbitration provision shall not apply in cases of non-payment of rent, or refusal of Management to accept rent due to default of Agreement, and when Management is therefore demanding possession of the Premises, and when such arguments would customarily be settled in a magistrate court of competent jurisdiction.

**(4)** In any case, neither party shall bring a claim against the other as a plaintiff or member in a class action proceeding.

**(5)** If Resident fails to demand arbitration for any non-monetary default within 30 days after the dispute arises, Resident shall be deemed to have waived the dispute.

**28. Wire-Fraud Warning.** Resident acknowledges that Management will never request the wiring of funds for any reasons associated with this Agreement. If Resident does receive electronic notification from anyone requesting the wiring of funds, before wiring any funds, Resident shall first verify by personal or telephonic communications with Management that the wire request is not fraudulent. Resident indemnifies and holds harmless Management from efforts to obtain funds through fraudulent wire transfers

**29. Resident Handbook.** This Agreement is supplemented by the Resident Handbook dated August 1, 2025. The undersigned hereby acknowledge and agree that all provisions of said handbook are equally enforceable as are the provisions of this Agreement. In the event that there is a conflict between interpretation of this Agreement and the Handbook, provisions of this Agreement shall prevail as the higher authority. By initialing and signing below I acknowledge that I have been given access to the Handbook and have read and agree to its terms.

TP
Resident's Initials | Resident's Initials | Resident's Initials

**30. Credit Reporting:** Resident authorizes Manager to collect from and report to credit bureaus before, during, and after tenancy until all amounts due are paid in full.

TP
Resident's Initials | Resident's Initials | Resident's Initials

31. **Exhibits:** The following exhibit(s), if checked, are attached hereto and made a part of this contract by reference.
- ☒ Required Insurance Exhibit
- ☒ No Oral Promises Exhibit
- ☒ Security Deposit. Scheduling Move-in Exhibit, Bedbugs
- ☒ Location of Trust Funds Notification Memorandum and Request for Reasonable Accommodation
- ☒ Yard and Garden Maintenance
- ☒ Lead-Based Paint and Flood Disclosure
- ☒ Particulate Matter/Mold/Mildew/Moisture Disclosure
- ☒ Move-in/Move-out Inventory (Completed upon Move-in)
- ☐ Premises Owner/Resident Security Indemnity and Declaration
- ☐
- ☐

32. **Special stipulations:** _____

**ACCEPTANCE DATE:** IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed without change in person or by a person duly authorized,

At 11 O'clock a .m. on this 28th day of Feb 2026.

3 Options Realty, LLC

By: [signature]

Broker License #60600 Agent # 376595
555 Sun Valley Dr, STE B4,
Roswell, Georgia 30076
Agent Direct (Text): 770-378-4673
Office: 678-397-1282 Official Fax: 770-992-6459
Email: derek@3optionsrealty.com
Agent is not an employee of Broker but rather an independent contractor.

X [signature] Tia Frasier
RESIDENT

X ____________________
CO-RESIDENT

X ____________________
CO-RESIDENT

# REQUIRED INSURANCE EXHIBIT

This Exhibit is attached to and becomes a part of the Agreement between Management and Resident(s) on the property located at: **5500 Sierra Trl Atlanta, GA 30349**, Dated **02/27/2026**

3 OPTIONS REALTY

For the duration of the Lease, Resident is required to maintain and provide the following minimum required insurance coverage:

- $100,000 Limit of Liability for Resident's legal liability for damage to Premises for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage ("Required Insurance"). Management shall be named as Additional Interest stated as:
  3 Options Realty 555 Sun Valley Dr. Suite B4 Roswell GA 30076 wecare@3optionsrealty.com

Resident is required to furnish Management with evidence of Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period. If at any time Resident does not have Required Insurance, Resident is in breach of the Agreement and Management shall have, in addition to any other rights under the Agreement, the right but not the obligation to purchase Required Insurance coverage protecting the sole interest of Premises Owner and seek contractual reimbursement from the Resident for all costs and expenses associated with such purchase.

Resident may obtain Required Insurance or broader coverage from an insurance agent or insurance company of Resident's choice. If Resident furnishes evidence of such insurance and maintains the insurance for the duration of the Lease, then nothing more is required. If Resident does not maintain Required Insurance, the insurance requirement of this Agreement may be satisfied by Management, who may purchase such coverage through Management's Landlord Liability Insurance Policy ("LLIP"). The coverage provided under the LLIP will provide the Required Insurance coverage listed above. An amount equal to the total cost to Management for the LLIP coverage shall be charged to Resident as a recoverable expense under the Agreement. Some important points of this coverage, which Resident should understand are:

**1**. LLIP is designed to fulfill the insurance requirement of the Agreement. Management is the Insured under the LLIP. This is a single interest master insurance policy. Resident is not an Insured, Additional Insured or beneficiary under the LLIP. All loss payments are made to Management.
**2.** LLIP coverage is NOT personal liability insurance or renters insurance. LLIP does not cover Resident's personal property (contents), additional living expenses or liability arising out of bodily injury or property damage to any third party. If Resident requires any of these coverages, then Resident should contact an insurance agent or insurance company of Resident's choice to obtain personal liability insurance or renters insurance to protect Resident's interests.
**3**. Coverage under the LLIP may be more expensive than the cost of Required Insurance obtainable by Resident elsewhere. At any time, Resident may contact an insurance agent or insurance company of their choice for insurance options to satisfy the Required Insurance under this Agreement.
**4**. If Resident has purchased Required Insurance and at any time allows such Required Insurance to lapse in breach of the Agreement, Management may purchase LLIP without notice and add the total cost associated therewith to Resident's monthly rent payment.
**5.** Licensed insurance agents may receive a commission on the LLIP.
**6**. The total cost to Resident for Management obtaining LLIP shall be ($10.50) per month, subject to no proration. This is an amount equal to the actual premium charge to Management including any premium taxes and fees due to state governing bodies. Additionally, an Administration Fee in the amount of ($4.50) to be retained by Management for processing and handling will be charged.
**7**. In the event that loss or damage to Premises exceeds the amount of Required Insurance, Resident shall remain contractually liable to Premises Owner for such amount. In the event of liability to any other party for bodily injury or property damage, Resident shall remain liable to such other party.
**8.** It shall be Resident's duty to notify Management of any subsequent purchase of Renters Insurance.

Scheduling of the premises under the LLIP is not mandatory and Resident may purchase Required Insurance from an insurance agent or insurance company of Resident's choice at any time and coverage under the LLIP will be terminated by Management.

| | | | |
|---|---|---|---|
| [signature] | | | 2/28/2026 |
| Resident Signature | Resident Signature | Resident Signature | Date |

# No Oral Promises Exhibit

OPTIONS REALTY

This Exhibit is attached to and hereby made a part of the Agreement between Management and Resident(s) on the property located at: **5500 Sierra Trl Atlanta, GA 30349**,
dated: **02/27/2026,**
For the Residents named: **Tia Frasier**.

**Other Promises:** The purpose of this Exhibit is for the Resident(s) to express (in writing) any promises made by Management during the application or lease (Agreement) negotiating process, or at any other time prior to execution of this Agreement, that have not been satisfactorily memorialized in the Agreement, but were relied upon by the Residents' in making the decision to enter into the Agreement, and for Management to acknowledge and accept the duty to perform under these promises.

Other promises:
**none**
_____
_____
_____
_____

**No Other Promises:** The undersigned certifies that Management has made **no other promises** at any time prior to execution of this Agreement, other than those expressed in writing above or as otherwise expressed in the Agreement.

**Future Promises:** The undersigned also acknowledges that any future promises made must be mutually agreed to, put in writing, adequate consideration exchanged, and made a part of this Agreement by reference and attachment.

Certified by my hand on the date above:

Resident Signature    Resident Signature    Resident Signature

Management Signature

**376595**
Agent License #

**H-60600**
Broker License #

# Deposit, Scheduling Move-In, Bedbugs Disclosure

This exhibit is attached to and hereby made a part of the Agreement between Management and Resident(s) on the property located at: **5500 Sierra Trl Atlanta, GA 30349**, dated: **02/27/2026**.

## Security Deposit

TP
Initials

Resident understands that the **security deposit must be in paid in certified funds at move-in,** for example, certified check or money orders — no cash under any conditions. Should resident arrive at move-in without certified funds, the inspection will not take place, there will be a $75 rescheduling charge, and the keys will not be given to resident. **Certified checks will be payable to Management**

## Scheduling Your Move-In or Move-Out Inventory

TP
Initials

Resident agrees to pay an additional fee to Management of $75 if they miss the appointment and need to reschedule, or $45 per hour for showing up late to move-in or move-out appointment.

## Bedbugs Disclosure

TP
Initials

Resident hereby certifies that there was no bedbug infestation in the premises of their immediate previous address, and that none of their personal affects were previously kept or stored on a premises infested with bedbugs.

# Location of Trust Funds Notification Memorandum and Request for Reasonable Accommodation

OPTIONS REALTY

**1. Trust Funds Location:** As soon as practicably possible, any funds specified as Security Deposits, and received from Resident(s), will be deposited in a designated trust account, Enterprise Bank & Trust, which has been registered with the Georgia Real Estate Commission. In the event that the Premises Owner should direct Management to assign management responsibilities to another management company or if the Premises Owner shall desire to take back personal control of the management of the Premises, then the undersigned hereby authorizes Management to transfer the security deposit and prepaid rents, if any, to the Assignee or Premises Owner, whichever the case may be. In the event of such assignment or take-back, Management shall notify the tenant in writing of the new location of the trust funds. Also, as may occur, from time to time, that Management may change banking institutions. In such event, Management will notify the Resident of the new location, and Resident hereby agrees to this change.

**2. Reasonable accommodation:** I have a need for reasonable accommodation as defined in fair housing laws as here stated:

Please acknowledge receipt, acceptance, and understanding of this memorandum by signing below.

Resident Signature: [signature]

Resident Signature: ______________________

Resident Signature: ______________________

Date: 2/28/2026

# Mold, Fungi, Particulate Matter, and Mildew (Discoloration), and Moisture Disclosure

Address: **5500 Sierra Trl Atlanta, GA 30349**

## Premises Owner's Disclosure

FLOODING, DRAINAGE, AND MOISTURE:

| | Yes | No | Don't Know |
|---|---|---|---|
| 1. Are you aware of any water leakage, dampness, or accumulation problems in the crawl space, basement, or other parts of the main dwelling at or below grade? | ☐ | ☒ | ☐ |
| 2. Are you aware of any repairs being made to control any water or dampness problems in the crawl space, basement, or other parts of the dwelling at or below grade? | ☐ | ☒ | ☐ |
| 3. Are you aware if the Premises, or any improvements thereon, is located in a flood zone? | ☐ | ☒ | ☐ |
| 4. Are you aware of any flooding or drainage problems? | ☐ | ☒ | ☐ |
| 5. Are you aware of any discoloration appearing on the interior of the premises other than on the walls, floors, or ceilings of bathrooms? | ☐ | ☒ | ☐ |

Disclosures: _____

X [signature] c04cc659 05-29-2024 X ____________ ________

**Premises Owner's Signature** **Date** **Co-Premises Owner's Signature** **Date**

## Resident's Acknowledgement

Resident acknowledges, as evidenced by signing below, that it is necessary for Resident to provide appropriate climate control, keep the Premises clean, and to take other measures to retard and prevent mold and mildew from accumulating in the Premises. Resident agrees to monitor his or her property for the presence of mold, mildew, or discoloration, or for any conditions that reasonably can be expected to give rise to such, such as instances of leaks, water intrusion, humidity and water damage. Resident further agrees to clean and dust the Premises on a regular basis and to remove visible moisture accumulation on windows, walls and other surfaces as soon as reasonably possible. Resident further agrees not to block or cover any of the heating, ventilation, or air-conditioning ducts in the unit. Resident further agrees to immediately report to the management office: (a) any evidence of a water leak or excessive moisture in the Premises, as well as in any storage room, garage or other common area; (b) any evidence of mold, mildew, or discoloration that cannot be removed by simply applying a common household cleaners and wiping the area; (c) any failure or malfunction in the heating, ventilation, air conditioning systems or laundry systems in the Premises; and (d) any inoperable doors or windows. Resident further agrees that Resident shall be responsible for damages to the Premises and Resident's property as well as injury to Resident and occupants resulting from Resident's failure to comply with the terms of this acknowledgment. Resident understands, acknowledges, and agrees that Resident has no claim against Landlord, Management and/or any agent, manager or employee of Management for any civil cause of action for personal or property damage arising from Resident's failure to comply with the terms of this acknowledgement. Resident shall take reasonable steps to educate Resident about mold, fungi, and mildew, and Management refers Resident to the website of the Environmental Protection Agency (www.epa.gov) for such purpose.

X [signature] X ____________ X ____________ 2/28/2026

Resident Co-Resident Co-Resident Date

# Flood, Licensed Premises Owner, & Lead Based Paint Disclosure

**Address:** 5500 Sierra Trl Atlanta, GA 30349

**1. Flood:** **The Georgia Land lord Tenant Act requires that Premises Owners disclose to potential tenants any material adverse physical conditions on the property, including the propensity to flood.** The statement below does ☐ or does not ☒ apply to this property:

This Property, or some portion of the living space, basement or attachments thereto, which will be covered by the rental agreement, has been damaged by seepage of water or flooding **during the five-year period** immediately preceding the date of this Agreement. The Premises Owner hereby instructs Broker to give written notice of this fact to all prospective tenants. (Flooding is defined as the inundation of a portion of the living space or basement covered by the lease that was caused by an increased water level in an established water source such as a river, stream, or drainage ditch, or as ponding of water at or near the point where heavy or excessive rain fell.)

**Does the property have a basement?** ☐ **Yes** ☒ **No**
**If so, does the basement get wet?** ☐ **Yes** ☐ **No**

Owner explanation for flooding: ______

## 2. Licensed Premises Owner Disclosure:

Premises Owner is ☐ or is not ☒ a licensed real estate agent in the state of _____, license #_____.

## 3. Lead Based Paint:

If subject property was built **after 1978**, initial here DFT and then skip to the bottom and sign.

Housing built before 1978 may present exposure to lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. If the landlord is aware of any information relative to lead-based paint hazards on the property, such will be made available to you prior to move-in. If this home was built prior to 1978, and the landlord reports no knowledge of lead-based paint hazards, you retain the right to have the property inspected for 10 days after receipt of this disclosure. If a lead-based paint hazard is detected, you may either rescind the associated lease without prejudice or appeal to the landlord to mitigate the hazard to a degree satisfactory to you.

### *Premises Owner disclosure:*

Presence of lead-based paint or lead-based paint hazards (Check applicable box.):

- ☐ Premises Owner/Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the house.
- ☐ Known lead-based paint and/or lead-based paint hazards are present in the house. Explanation: _____

Records and reports available to the Premises Owner/Lessor (Check one below.):

- ☐ Premises Owner/Lessor has no reports or records pertaining to lead-based paint and/or lead based paint and/or lead-based paint hazards in the house.
- ☐ Premises Owner/Lessor has provided undersigned tenant(s) with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the house. Explanation: _____

[signature] 05-29-2024
**Premises Owner Signature** **Co-Premises Owner Signature**

**Agent acknowledgment:**

DL Agent has informed the Premises Owner/Lessor of the Premises Owner/Lessor's obligations under Title 42 U.S.C., and
Initials has provided the pamphlet "Protect Your Family from Lead in Your Home" to the tenant.

By signing my name below I hereby warrant I have read, understand, and agree with all of the above, and that if the home was built prior to 1978, that I have received the pamphlet "Protect Your Family From Lead In Your Home".

[signature] 2/28/2026
Tenant Signature Co-Tenant Signature

CRMC